IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID EDWARD HERNANDEZ,<br><br>  Plaintiff,<br><br>  v.<br><br>NANCY BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>  Defendant.<br>                                                           / | No. C 15-04032 WHA<br><br>**ORDER GRANTING IN PART<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND<br>DENYING DEFENDANT'S<br>CROSS-MOTION FOR<br>SUMMARY JUDGMENT** |

### INTRODUCTION

In this social security appeal, this order holds that the administrative law judge improperly discounted the weight of a treating physician's opinion. Accordingly, plaintiff's motion for summary judgment is **GRANTED IN PART** and the Acting Commissioner's cross-motion for summary judgment is **DENIED**.

### STATEMENT

**1.  PROCEDURAL HISTORY.**

In November 2011, plaintiff David Hernandez applied for disability insurance benefits and supplemental security income, alleging he had been unable to work since October 2011 due to lower back pain, heart problems, gout, chronic pain, and sleep apnea (AR 52, 174–81). The Social Security Administration denied his application both initially and upon reconsideration. He timely requested an administrative hearing (AR 21).

At a hearing in November 2013 (AR 1047–84), ALJ Tamia Gordon found Hernandez had several severe impairments, but ultimately concluded he was not disabled (AR 23, 31). In July 2015, the appeals council denied Hernandez's request for administrative review (AR 1). Hernandez filed the instant action in September 2015, seeking judicial review pursuant to Section 405(g) of Title 42 of the United States Code. Both sides move for summary judgment. Hernandez's primary contention is that the ALJ failed to properly evaluate the opinion of his treating physician, Anupama Poliyedath, M.D. This order follows full briefing.

**2. MEDICAL EVIDENCE.**

In late September 2011, the Alameda County Medical Center Emergency Department admitted Hernandez for complaints of acute back pain after the Oakland Police allegedly shot him in the back with a rubber bullet.

In March 2012, Rustom Damania, M.D., an internist consulted by the state agency, performed an internal medicine evaluation of Hernandez. His opinion included a recitation of Hernandez's medical and social history, a review of his organ systems, a physical examination, his diagnostic impression, and his assessment of Hernandez's functional capacity. He opined that Hernandez "should be able to" lift and carry twenty pounds occasionally and ten pounds frequently; could stand, walk, and sit without restriction; had no postural or manipulative limitations; did not need an assistive device for ambulation; and that Hernandez had no relevant visual or communicative impairments.[1]

In December 2012, J. Linder, M.D., a physician at the state agency, reviewed Hernandez's record to determine Hernandez's residual functional capacity. Dr. Linder concluded Hernandez had the functional capacity to lift and carry up to 20 pounds occasionally and ten pounds frequently, stand and walk for four hours, and sit for six hours, out of an eight-hour workday. He could not climb ladders, ropes, or scaffolds, but could occasionally stoop, kneel, crouch, or crawl. Dr. Linder based his findings on, among other records, a

---

[1] Dr. Damania's signature indicates he is "Board Eligible," or, in other words, that he is *not* licensed and therefore *not* an "acceptable medical source" as the regulations define it. *See* 20 C.F.R. 404.1502. It is not apparent the ALJ recognized as much. The proper inquiry is to weigh the opinions of acceptable medical sources first and then determine if good reason exists to preference Dr. Damania. *See* 20 C.F.R. 416.927(f).

2

computerized tomography scan taken in September 2011 following being shot in the back by a rubber bullet earlier that day. The CT scan revealed mild diffuse degenerative changes throughout his thoracolumbar spine with disc space height narrowing and bony spurring (AR 103–15).

In February 2013, magnetic resonance imaging of Hernandez's spine revealed moderate lumbar stenosis and cervical disc protrusion (AR 789–90).

In March 2013, Hernandez visited his primary care facility, the internal medicine center at the Community Medical Center clinic, for a follow-up appointment. At this visit, Dr. Poliyedath, a faculty physician supervising the exam, completed a form for the County of Fresno's general relief program, which provided aid for unemployable or incapacitated residents. The signature on the form was and remains illegible, but Dr. Poliyedath's medical licence number appeared below it. He opined that Hernandez could not work due to lumbar stenosis and disc protrusion in his cervical spine "which ma[de] it difficult for [him] to sit or stand for extended periods of time" (AR 795). The rest of the form primarily consisted of boxes where Dr. Poliyedath checked off three "limitations/work restrictions," indicating Hernandez could not drive or perform work requiring climbing ladders or using powered equipment, could not engage in repetitive bending or lifting, and could not stand or walk for less than fifteen minutes per hour. He left four boxes blank, indicating Hernandez had above a fourth grade reading, writing, and math capacity; could perform more than light work limited to lifting less than twenty pounds at one time; could perform repetitive hand movements such as typing for more than ten minutes an hour; and could interact with the public. The form identified October 2011 as the onset date of the disabling condition and indicated Dr. Poliyedath expected to release Hernandez to work by March 2014 (AR 795–96).

Resident physician Amita Kalra, M.D., completed progress notes from the same March 2013 visit involving the county relief form. Dr. Poliyedath attested to the notes and added minor additional comments from his review. The progress notes included a social and medical history of Hernandez, a review of Hernandez's organ systems, a list of his active medical problems, notes from the physical exam performed during the visit, and Hernandez's

3

1    treatment plan going forward. This treatment plan included decisions to continue, titrate, or
2    discontinue Hernandez's medications; referrals to physical and occupational therapists and an
3    orthopedist; setting a weight loss goal; scheduling various follow-up appointments; and
4    ordering "basic labs" prior to the next follow-up. The notes also indicated that the physicians
5    reviewed labs and imaging and signed the county general relief form (AR 891–93).

### 3. TESTIMONY AT THE ADMINISTRATIVE HEARING.

At the hearing, the ALJ heard testimony from Hernandez and Jose Chaparro, a vocational expert. Hernandez testified that constant pain in his back prevented him from working. He also referenced his knee pain, but ultimately attributed his alleged disability to his lower back pain. He named the internal medicine clinic at the Community Regional Hospital as his primary care provider and, when pressed for the name of a specific primary care doctor, identified Adnan Ameer, M.D., who had treated him in May 2013 under the supervision of Dr. Poliyedath (AR 1058–71).

A vocational expert, Jose Chaparro, testified that a person of Hernandez's age, education, and work experience, who "possess[ed] the residual functional capacity to perform light work [but not] climb ladders, ropes or scaffolds [and only] occasionally climb ramps, or stairs, [and] occasionally stoop, crouch, kneel or crawl," could work as a clearing supervisor, a fast food worker, cashier II, ticket seller, or outside deliverer. Some available jobs in the latter three fields offered Hernandez the ability to sit or stand throughout the day. With the added condition of being unable to sustain sufficient concentration, persistence, or pace for an eight-hour workday schedule, however, Chaparro testified "[t]here's no past work and there's no other work" (AR 1079–82).

The ALJ's findings — laid out below — are based on the testimony of these two individuals only, in addition to the evidence in the record.

## ANALYSIS

### 1. LEGAL STANDARD.

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

4

Substantial evidence is "more than a scintilla," but "less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ibid.* The Court must "review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion." *Andrews*, 53 F.3d at 1039. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities"; thus, where the evidence is susceptible to more than one rational interpretation, the decision of the ALJ must be upheld. *Ibid.*

Disability claims are evaluated using a five-step inquiry. 20 C.F.R. 404.1520. In the first four steps, as to which the burden is on the claimant, the ALJ must determine (i) whether the claimant is working, (ii) the medical severity and duration of the claimant's impairment, (iii) whether the disability meets any of those listed in Appendix 1, Subpart P, Regulations No. 4, and (iv) whether the claimant is capable of performing his or her previous job.

The final step, number five, involves a determination of whether the claimant is capable of making an adjustment to other work. 20 C.F.R. 404.1520(a)(4)(i)–(v). At step five, the burden shifts to the Commissioner "to show that the claimant can engage in other types of substantial gainful work that exists in the national economy." *Andrews*, 53 F.3d at 1040.

**2. THE ALJ'S FIVE-STEP ANALYSIS.**

At step one, the ALJ found that Hernandez had not engaged in substantial gainful activity since the alleged onset date of his disability in October 2011 (AR 23).

At step two, the ALJ found Hernandez suffered several severe impairments, including degenerative spinal stenosis, sleep-related breathing disorder, hypertension, hyperlipidemia, deep vein thrombosis of the right leg, obesity, and diabetes mellitus (*ibid.*).

At step three of the analysis, the ALJ found that none of Hernandez's impairments or combination of impairments met or equaled any impairment that would warrant a finding of disability without considering age, education, or work experience (AR 24–25). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ began her analysis at step four by determining Hernandez's residual functional capacity. Adopting the vocational expert's testimony, she found that Hernandez could perform light work with several limitations. Specifically, the ALJ found Hernandez could lift and carry up to twenty pounds only occasionally and ten pounds frequently, and sit, stand, and walk six hours in an eight-hour workday. She also found that Hernandez's impairments precluded him from climbing ladders, ropes, or scaffolds. She further found Hernandez could occasionally climb ramps and stairs, and occasionally stoop, crouch, kneel, or crawl. Based on this residual functional capacity, the ALJ found Hernandez incapable of performing any of his past relevant work (AR 25–29).

Nevertheless, at step five, the ALJ determined that Hernandez could work in the national economy based on his age, work experience, and residual functional capacity. The potential jobs the ALJ determined Hernandez could perform included clearing supervisor, cashier II, and fast food worker. The ALJ thus concluded that Hernandez was not disabled (AR 30–31).

### 3. THE ALJ ERRED IN HER TREATMENT OF DR. POLIYEDATH'S OPINION.

Hernandez contends that the ALJ erred in her residual functional capacity assessment by improperly discounting Dr. Poliyedath's opinion. Specifically, the ALJ stated (AR 26–27):

> The county form completed for entitlement to General Relief is given little weight. The form does not indicate the title of the person completing the form, and the signature is illegible. Consequently, it is impossible to determine if this person is an acceptable medical source. Furthermore, no information is provided regarding what medical signs of laboratory findings this opinion was based upon (Exhibit 9F).

This explanation is insufficient to discount Dr. Poliyedath's opinion. *First*, the ALJ stated "it [was] impossible to determine" if the person who completed the form was an acceptable medical source. Not so. The treatment records clearly indicate the form was completed during the March 19 visit with Dr. Poliyedath and a resident (AR 891–93), and below the illegible signature is the address of the clinic as well as Dr. Poliyedath's medical license number (AR 796). Thus, it is not impossible to identify the author of the opinion.

The Commissioner does not offer any arguments to the contrary. After repeating the ALJ's findings, the Commissioner skips over the illegibility issue to argue that the lack of

6

laboratory findings and a variety of post hoc reasons justified the ALJ's conclusions (Df. Opp. at 5).

The Commissioner overlooks the importance of the ALJ's error. Dr. Poliyedath was (and remains) a licensed physician and thus was (and remains) an "acceptable medical source" per Section 404.1513 of Title 20 of the Code of Federal Regulations. Because Dr. Poliyedath is an acceptable medical source, the ALJ must consider whether he is a treating source. Treating source opinions, unlike other medical opinions, are entitled to controlling weight if well-supported and uncontradicted. If they are not entitled to controlling weight, however, an ALJ still must provide specific and legitimate reasons supported by substantial evidence to discount or reject a treating physician's opinion. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). In light of this standard, this action is remanded to ensure the ALJ properly weighs the opinion of Dr. Poliyedath as an acceptable medical source, and particularly considers whether or not he is a treating source.[2]

The Commissioner argues the ALJ's second ground for discounting Dr. Poliyedath's opinion is sufficient to affirm her holding. The ALJ stated "no information [was] provided regarding what medical signs of laboratory findings" the unidentified author's opinion was based on. Two factual inaccuracies in the ALJ's decision suggest at least one reason the ALJ may find otherwise.

*First*, Hernandez underwent an MRI at the Community Medical Center in February 2013 rather than February 2012. *Second*, Dr. Poliyedath issued his opinion in March 2013, rather than January 2013. With these facts clarified, the record reveals Dr. Poliyedath's March 2013 opinion followed soon after the MRI. The progress notes from March the visit in which Dr. Poliyedath completed the general relief form mention that imaging was reviewed (AR 891). The March visit was Hernandez's first visit primary care visit since taking the MRI. The MRI results revealed lumbar stenosis and disc protrusion in Hernandez's cervical spine, mirroring and

---

[2] Beyond considering whether a physician is a treating source, the ALJ must also consider the length, nature, and extent of the physician's treatment relationship with the patient; whether the physician examined the patient and supported his or her findings; if the findings were consistent with the record as a whole; if the physician specialized in a relevant area; and any other issues presented. 20 C.F.R. 404.1513.

7

ostensibly serving as the basis for Dr. Poliyedath's conclusions in the general relief form. Furthermore, Dr. Damania's March 2012 opinion and Dr. Linder's December 2012 opinion, occurred prior to the MRI — *not* before the MRI, as would have been the case if the MRI was taken in February 2012.

Further, simply identifying Dr. Poliyedath as the author of the general relief form informs other portions of the record where Dr. Poliyedath is mentioned. He supervised two residents who examined Hernandez during follow-up appointments (AR 879, 888). Specifically, the ALJ will see the progress notes from the March 19 visit, at which Hernandez presented the general relief form that Dr. Poliyedath signed (AR 891, 893). Dr. Poliyedath attested to progress notes prepared by the resident which included documentation of Hernandez's medical and social history, a review of his organ systems, a physical exam, a review of his recent labs and imaging, a list of his current diagnoses from previous visits to the clinic, and a treatment plan. The treatment plan, to which Dr. Poliyedath gave the final seal of approval, included decisions to continue, titrate, or discontinue Hernandez's medications; referrals to physical and occupational therapists and an orthopedist; setting a weight loss goal; scheduling various follow-up appointments; and ordering "basic labs" prior to the next follow-up (AR 891–93). With the identification of Dr. Poliyedath as the author of the general relief form, the Commissioner's argument — that no information is provided regarding what medical signs or laboratory findings the opinion was based on — suspends disbelief.

The Commissioner also urges a distinction between Dr. Poliyedath's check-the-box format opinion in the general relief form and the opinions of Drs. Linder and Damania. While it is permissible to reject a check-the-box report from physician opinions that do not contain any explanation of the bases for their conclusions, *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996), an ALJ errs in rejecting those based on experience with the claimant and supported by numerous records. *Garrison*, 759 F.3d at 1013. Dr. Poliyedath's form includes his written explanation for why he concludes Hernandez is unable to work. Moreover, when viewed in connection with the examination in which the form was signed, the labs and imaging reviewed during the March visit, and the clinic's treatment history with Hernandez, it is evident that the

8

check-the-box format of Dr. Poliyedath's opinion will not be fatal. In tandem, the progress notes and the general relief form include just as much, if not more, explanation than the opinions the ALJ does rely upon.

Finally, the Commissioner urges two other reasons for affirming the ALJ's decisions. *First*, that the frequency and length of treatment with Dr. Poliyedath is unclear and *second*, that the notes from the two visits Hernandez claims Dr. Poliyedath treated him at reveal that Hernandez's condition was stable and no services were provided. On appeal, "[w]e review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Both of the given reasons fail because the ALJ did not rely on, or even discuss, any visits with Dr. Poliyedath. These post hoc reasons are addressed at length by both parties and the ALJ will be benefitted by their arguments on remand.

### 4. REMAND FOR FURTHER PROCEEDINGS IS APPROPRIATE HERE.

Hernandez argues remand should be for the narrow purpose of awarding benefits. Remanding for the narrow purpose of calculating and awarding benefits is appropriate only if (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; *and* (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison*, 759 F.3d at 1020.

Hernandez fails at the third part of this analysis. The ALJ still may find that Dr. Poliyedath's opinion is not well-supported or that it is contradicted by the evidence in the record as a whole.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is **GRANTED IN PART** and defendant's cross-motion for summary judgment is **DENIED**. This action is **REMANDED** for further proceedings.

**IT IS SO ORDERED.**

Dated: March 30, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE